UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| BOOKLOCKER.COM, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV-08-160-B-W |
| | ) | |
| AMAZON.COM, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON MOTION TO DISMISS**

An independent print on demand publishing company, BookLocker.com (BookLocker), brought this class action claiming a violation of federal antitrust law against a leading online retailer, Amazon.com (Amazon), for allegedly tying its online bookstore services with the printing services provided by its wholly owned subsidiary. Before the Court is Amazon's Motion to Dismiss (Docket # 38) pursuant to Rule 12(b)(6). Aside from one issue, Plaintiff raises a right to relief above the speculative level. Accordingly, the motion is primarily denied.

**I.     PROCEDURAL HISTORY**

BookLocker filed its Complaint against Amazon on May 19, 2008, asserting one count of unlawful tying in violation of the Sherman Act, 15 U.S.C. § 1. *Compl.* (Docket # 1). On June 30, 2008, Amazon filed a motion to dismiss. *Def.'s Mot. to Dismiss* (Docket # 13). Oral argument on the motion was held on February 9, 2009. *Minute Entry* (Docket # 26). The next day, and prior to a decision on the pending motion, BookLocker moved to amend the Complaint. *Pl. BookLocker.com's Notice of Amendment of Compl. or, in the alternative, Mot. for Leave to Amend the Compl.* (Docket # 27). On February 17, 2009, a conference of counsel was held during which the motion to amend was granted, and Amazon withdrew its motion. *Minute Entry*

(Docket # 29); *Oral Order Granting Mot. to Amend* (Docket # 30); *Oral Withdrawal of Mot. to Dismiss* (Docket # 31). The same day BookLocker filed its Amended Complaint. *Am. Compl.* (Docket # 33). Amazon filed the pending motion to dismiss on March 20, 2009. *Def.'s Mot. to Dismiss Am. Compl.* (Docket # 38) (*Def.'s Mot.*). BookLocker responded on April 23, 2009, *Pl. BookLocker.com's Mem. in Opp'n to Def. Amazon.com's Mot. to Dismiss Am. Compl.* (Docket # 43) (*Pl.'s Opp'n*), and Amazon replied on May 20, 2009. *Reply in Support of Def.'s Mot. to Dismiss Am. Compl.* (Docket # 46) (*Def.'s Reply*).

## II.    LEGAL STANDARD

"Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation omitted). Rule 12(b)(6), however, provides that a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The Supreme Court recently addressed the standard to be applied to a Rule 12(b)(6) motion:

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' [*Twombly*, 550 U.S. at 570]. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* at 556. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Id.* Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.' *Id.* at 557 (brackets omitted).

*Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 1950.

Faithful application of this standard is particularly important in the context of a potentially expensive antitrust suit. "[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief, 'this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court.'" *Twombly*, 550 U.S. at 558 (quoting 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1216, at 233-34 (3d ed. 2004)). "Thus, it is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, but quite another to forget that proceeding to antitrust discovery can be expensive." *Id.* (internal citation omitted); *see also Euromodas, Inc. v. Zanella, Ltd.*, 368 F.3d 11, 17 (1st Cir. 2004) ("Antitrust liability is strong medicine . . . and thus section 1 of the Sherman Act has been authoritatively interpreted to limit the inferences that may be drawn from ambiguous evidence.").

## III.    FACTUAL BACKGROUND

The Court begins its analysis with a recitation of BookLocker's well-pleaded factual allegations entitled to the assumption of truth. *See Iqbal*, 129 S. Ct. at 1950; *Fitzgerald v. Harris*, 549 F.3d 46, 52 (1st Cir. 2008) ("We assume the truth of all well-pleaded facts in the complaint, drawing all reasonable inferences in the plaintiff's favor.").

### A.    The Parties

BookLocker is an independent print on demand (POD) publishing company with approximately 1,200 books currently available. *Am. Compl.* ¶¶ 3, 11. "Print on demand" refers to "both a printing technology and business process in which copies of a book are only printed when an order has been received from a consumer or retail bookseller, and only the number of books that have been ordered are printed." *Id.* ¶ 3. The "print on demand" model allows "for very small print runs for lower-demand titles for which traditional printing technology, such as

offset printing, is uneconomical." *Id.* According to BookLocker, there are "thousands of POD publishers" in the United States publishing "hundreds of thousands of titles." *Id.* ¶ 4. These publishers "use a variety of printing companies to print physical copies of the books in their catalogs as those books are ordered." *Id.* ¶ 5. Presently, Lightning Source, Inc. (Lightning Source) "is the leading printer of POD books." *Id.*

"[T]raditional brick-and-mortar bookstores (like Borders or Barnes & Nobles) generally do not stock books from POD publishers." *Id.* ¶ 23. Instead, POD books are predominantly sold in the "Online Book Market," which BookLocker defines as "the market for physical books ordered online by consumers and then delivered to consumers by means of a shipping service." *Id.* ¶¶ 6, 22-23.

Amazon, "widely recognized as being the largest Internet retailer in the world," "owns and operates the Amazon bookstore [(the Bookstore)], an Internet site that sells books to consumers." *Id.* ¶ 6. "Amazon's Bookstore is the dominant channel through which consumers purchase POD books in the Online Book Market." *Id.* ¶ 24. According to BookLocker, "Amazon has significant power in the Online Book Market, with a market share of up to 70%." *Id.*

**B.     POD Book Sales on Amazon.com**

Consumers generally purchase POD books from the Amazon Bookstore in one of two ways. *Id.* ¶ 25. First, "consumers may purchase POD books directly from Amazon" by clicking on "a prominent button labeled 'Add to Shopping Cart'" (the Direct Amazon Sales Channel). *Id.* "The vast majority of POD books sold in the Bookstore" are sold in this manner because purchasing via the Direct Amazon Sales Channel offers consumers "the privacy and security of purchasing direct from Amazon and various free shipping deals that Amazon offers for products

4

purchased directly from Amazon." *Id.* According to the website of Amazon's subsidiary, BookSurge, the availability of a POD book in the Direct Amazon Sales Channel is "'a distinction proven to lift sales.'" *Id.*

As an alternative to the Direct Amazon Sales Channel, "Amazon allows third-party vendors to sell books on Amazon through a program known as 'Amazon Marketplace'" (the Marketplace). *Id.* ¶ 26. Consumers purchasing books in this manner "must provide shipping information to the third-party vendor and cannot take advantage of Amazon's free shipping programs." *Id.* "Only a small fraction of POD book Bookstore sales" are completed through the Marketplace. *Id.*

### C.     Amazon's POD Sales Service

According to BookLocker, Amazon "acts as a direct-sales agent" or "sales broker" rather than as a traditional retailer with regard to its "sales" service for POD books sold via the Direct Amazon Sales Channel. *See id.* ¶¶ 7, 27, 29. After an Amazon customer orders a POD book over Amazon's website and simultaneously pays for the POD book with a credit card, Amazon transmits the order to the POD publisher's printer, which then prints a copy of the ordered book and "drop ships" it directly to the customer using an Amazon label. *Id.* ¶¶ 7, 28. Amazon "generally does not pay for POD books in advance or maintain inventory of POD books in its warehouses" or "take title or possession" of POD books. *Id.* ¶ 29. POD publishers "pay Amazon a percentage of the sales price [of the ordered book] for the service it provides." *Id.*

### D.     Amazon's POD Printing Service

In April 2005, "Amazon acquired BookSurge, a company that, among other services, provides printing services to POD publishers." *Id.* ¶¶ 8, 30. Several companies compete in the POD printing market, however, "Lightning Source has been the dominant POD printing service,"

printing "over 1 million books every month on behalf of over 4,300 publishers." *Id.* ¶¶ 8, 31. BookLocker "presently prints its books through Lightning Source," *id.*; BookSurge "is a competitor of Lightning Source." *Id.* ¶¶ 8, 32.  According to BookLocker, BookSurge charges higher fees than its competitors. *Id.* ¶¶ 8, 33.  Under BookLocker's contract with Lightning Source, Lightning Source remits seventy percent of the list price of each book it prints to BookLocker. *Id.* ¶ 33.  By contrast, BookSurge would remit only fifty percent. *Id.* Were it to use BookSurge, BookLocker claims, the difference would cause it to incur a loss on almost every book sold. *Id.* ¶ 34.  BookLocker "would be forced to raise book prices across the board and lower author royalties, which would price many of [BookLocker's] books beyond what the market will bear." *Id.* In addition, BookSurge prints books of lower quality than its competitors, including Lightning Source. *Id.* ¶¶ 8, 35.

### E.    Amazon's Alleged Tying Scheme

"[B]eginning no later than February 10, 2008, Amazon began notifying POD publishers that Amazon would only continue to sell POD books through the Direct Amazon Sales Channel if the publisher agreed to print its books through BookSurge." *Id.* ¶ 9, 36.  On March 26, 2008, John Clifford, an Amazon representative, delivered this message to BookLocker. *Id.* ¶ 37.  Mr. Clifford informed BookLocker that books printed by Lightning Source or any other competing printer would have their "Add to Shopping Cart" buttons removed. *Id.*

On March 31, 2008, "Amazon issued an 'Open letter to interested parties' publicly stating and confirming that Amazon would only continue to sell POD books through the Direct Amazon Sales Channel that were printed through BookSurge rather than a competitor's printing service." *Id.* ¶ 39.  BookLocker alleges that "Amazon has continued through the present date to

threaten POD publishers that unless they purchase the BookSurge printing service, their Direct Amazon Sales Channel will be discontinued." *Id.* ¶ 40.

As an alternative to transitioning to BookSurge, "Amazon has informed POD publishers that they may keep the Direct Amazon Sales Channel active if they agree to enroll in a program known as 'Amazon Advantage'" (Advantage). *Id.* ¶ 41. According to BookLocker, however, "the terms and conditions" of Advantage "are so onerous so as to preclude it from being an economically viable option for POD book publishers." *Id.* Under Advantage, a publisher must deposit, at the publisher's expense, five copies of each of its titles with Amazon, a requirement BookLocker contends "would be prohibitively expensive." *Id.* As BookLocker publishes 1,200 titles, it would have to pay for 6,000 books to be printed and supplied to Amazon before it could join Advantage, a start-up cost BookLocker estimates would "easily exceed $35,000." *Id.* Also, under Advantage, "Amazon only remits 45% of a POD book's list price to the publisher once it has been purchased by an ultimate consumer." *Id.* BookLocker alleges that adherence to the terms of the Advantage program "would force Plaintiff to sell its books at a loss or to price its books beyond what the market will bear." *Id.* Participants in the Advantage program pay an annual membership fee of $29.95. *Def.'s Mot.* at Attach. 2, *Advantage Membership Agreement* ¶ 4 (Docket # 38-3) (*Advantage Membership Agreement*).[1]

---

[1] Ordinarily, in ruling on a motion to dismiss, "a court may not consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment." *Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33-34 (1st Cir. 2001). In *Alternative Energy*, the First Circuit described "a narrow exception" to this rule "'for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint.'" *Id.* (quoting *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993)). "When the complaint relies upon a document, whose authenticity is not challenged, such a document merges into the pleadings and the court may properly consider it under a Rule 12(b)(6) motion to dismiss." *Id.* (internal quotations omitted); *see also Town of Norwood v. New Eng. Power Co.*, 202 F.3d 408, 414 (1st Cir. 2000) (noting that in addressing a motion to dismiss a tying claim, a district court "considered the allegations in the complaint, documents attached to it, and matters of public record").

Here, Amazon attached two documents to its motion to dismiss: 1) an open letter to interested parties regarding Amazon's POD policy, and 2) the Advantage Membership Agreement. *Def.'s Mot.* at Attach. 1, *Open Letter to Interested Parties* (Docket # 38-2); *Def.'s Mot.* at Attach. 2, *Advantage Membership Agreement* (Docket #

BookLocker similarly discounts the Marketplace option whereby POD publishers sell books on the Amazon website, but not via the Direct Amazon Sales Channel. A "significant proportion" of sales in the Marketplace are for used or out-of-print books and, according to BookLocker, sales of POD books would be "substantially lower" through the Marketplace than through the Direct Amazon Sales Channel. *Am. Compl.* ¶¶ 42-43. For consumers, Marketplace is a less desirable method of purchasing books because the consumer must share shipping information with a third-party vendor and cannot take advantage of Amazon's free shipping programs. *Id.* Amazon requires Marketplace booksellers "to charge a preset amount per book for shipping that frequently exceeds the actual shipping costs," a practice BookLocker contends results in higher end costs for consumers and reduced sales for POD publishers. *Id.* ¶ 42. Because of these issues, "some of [BookLocker's] authors have advised that if Plaintiff is not able to sell through the Direct Amazon Sales Channel, those authors will retain other publishers who do use BookSurge, or will go to BookSurge directly." *Id.* ¶ 43. BookLocker also alleges that participation in the Marketplace would result in additional data entry requirements that would require Plaintiff to hire additional staff. *Id.* ¶ 44.

BookLocker asserts that Amazon's actions prevent POD publishing companies from selecting a printing service on a competitive basis. *Id.* ¶ 45. BookLocker notes that "Amazon's requirement that POD publishers sign a contract with BookSurge to have access to the Direct Amazon Sales Channel applies across the board to *all* publishers using POD printing services," *id.* ¶ 46 (emphasis in original), and alleges that "at least four POD publishers have been coerced into signing a contract with BookSurge (with the attendant higher prices and poorer quality) in

---

38-3). In its opposition, BookLocker does not challenge the authenticity of these documents. Further, BookLocker's Amended Complaint references the terms of the Advantage Agreement, *Am. Compl.* ¶ 41, and Amazon's POD policy is central to BookLocker's claim. Accordingly, the Court considers Amazon's submissions in ruling on Amazon's motion.

order to secure and retain customers." *Id.* ¶ 47.   BookLocker alleges that it has been harmed financially by Amazon's actions "because several potential clients (authors) stated that they refused to use Plaintiff's POD publishing services after being informed that Plaintiff had not signed the BookSurge contract because Plaintiff could not guarantee that [the authors'] books would be sold through the Direct Amazon Sales Channel." *Id.* ¶ 48.   In sum, BookLocker contends that Amazon's conduct presents POD publishers "an untenable choice":   "either continue to lose business due to the improper restriction on the Direct Amazon Sales Channel or be forced into signing with BookSurge." *Id.* ¶ 49.

## IV.   DISCUSSION

The Court next considers whether BookLocker's well-pleaded factual allegations plausibly suggest an entitlement to relief. *Iqbal*, 129 S. Ct. at 1951.   BookLocker contends that Amazon's policy of cutting-off access to the Direct Amazon Sales Channel to POD publishers unless those publishers agree to print their books with BookSurge constitutes a *per se* tying violation of § 1 of the Sherman Act.[2]   Amazon vigorously disputes whether BookLocker's claim can properly be characterized as tying.   *Def.'s Mot.* at 15-21.   According to Amazon, BookLocker's Complaint must be dismissed because it fails to sufficiently allege the generic requirements for a cause of action brought under § 1 of the Sherman Act:   1) an agreement between two or more actors, and 2) the actors' agreement must involve either restrictions that are

---

[2] BookLocker's Amended Complaint does not assert that Amazon violated the "rule of reason," instead focusing on a *per se* theory.  *See Am. Compl.* ¶ 55; *see also Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 29-31 (1984) (noting that in the absence of *per se* liability, an antitrust plaintiff must prove the defendant's conduct had an "actual adverse effect on competition"); *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1178 n.54 (1st Cir. 1994).  In any event, the gap between a *per se* claim and a rule of reason claim in the tying context may not be wide. *See Lee v. Life Ins. Co. of N. Am.*, 23 F.3d 14, 16 (1st Cir. 1994) ("Since many product ties may not prove anti-competitive, notwithstanding their somewhat misleading epithet, *per se* tie-ins may require a fairly subtle antitrust analysis of market power, a fact-intensive inquiry aimed at winnowing out only those ties most likely to threaten anti-competitive harm." (internal quotations omitted)); *Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Ltd.*, No. 02-12102-RWZ, 2006 U.S. Dist. LEXIS 43690, at *72 (D. Mass. June 28, 2006) ("[I]n recent years, [the *per se* and rule of reason] theories have essentially merged, rendering separate analysis unnecessary."); *AVX Corp. v. Cabot Corp.*, 600 F. Supp. 2d 286, 288 (D. Mass. 2009).

9

*per se* illegal or restraints of trade that fail scrutiny under the rule of reason. *Id.* at 3 (citing

*Euromodas*, 368 F.3d at 16).[3]

### A.    Tying

"Section 1 of the Sherman Act prohibits a seller from 'tying' the sale of one product to

the purchase of a second product if the seller thereby avoids competition on the merits of the

'tied' product."[4] *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1178 (1st Cir.

1994); *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5-6 (1958). There are four elements of a *per*

*se* tying claim:

> (1) the tying and tied products are actually two distinct products; (2) there is an
> agreement or condition, express or implied, that establishes a tie; (3) the entity
> accused of tying has sufficient economic power in the market for the tying
> product to distort consumers' choices with respect to the tied product; and (4) the
> tie forecloses a substantial amount of commerce in the market for the tied product.

*Data Gen. Corp.*, 36 F.3d at 1179; *Borschow Hosp. & Med. Supplies v. Cesar Castillo Inc.*, 96

F.3d 10, 17 (1st Cir. 1996). To survive Amazon's motion, BookLocker's Amended Complaint

---

[3] A preliminary matter merits brief discussion. BookLocker brought this suit as a putative class action. Under Rule 23(c)(1)(A), when a plaintiff sues as a representative of a class, the court must "[a]t an early practicable time" determine by order whether to certify the action as a class action. Fed. R. Civ. P. 23(c)(1)(A). To date, class certification has not been attained in this matter. Nevertheless, it is "'well-settled that, absent prejudice to the plaintiff, a court may decide a defendant's [dispositive motion] in a putative class action before taking up the issue of class certification.'" *Good v. Altria Group, Inc.*, 231 F.R.D. 446, 447 (D. Me. 2005) (granting motion to stay) (quoting *Evans v. Taco Bell Corp.*, No. 04-CV-103-JD, 2005 U.S. Dist. LEXIS 20997, at *11 n.6 (D.N.H. Sept. 23, 2005)); *see also Sanchez v. Triple-S Mgmt., Corp.*, 492 F.3d 1 (1st Cir. 2007) (affirming district court grant of summary judgment prior to class certification). Here, no prejudice to either BookLocker or the putative class members is apparent, and BookLocker has not objected to having the motion to dismiss decided before class certification. As a consequence of the pre-certification nature of the matter, for the purposes of assessing the pending motion to dismiss, "the potential claims of putative class members other than the named plaintiff are simply not before the court." *Evans*, No. 04-CV-103-JD, 2005 U.S. Dist. LEXIS 20997, at *11. Therefore, in reviewing the motion, BookLocker's claim is treated as being brought solely by BookLocker. *Id.*; *see also Rutan v. Republican Party of Ill.*, 868 F.2d 943, 947 (7th Cir. 1989) ("Because no class of plaintiffs or defendants were certified, only the named plaintiffs and named defendants are before this court."), *rev'd in part on other grounds*, 497 U.S. 62 (1990). At oral argument, the parties agreed that the Court should proceed with the motion to dismiss despite the fact the class has not yet been certified.

[4] The tying and tied products can be services rather than physical goods. *See, e.g., Data Gen. Corp.*, 36 F.3d at 1179-80 (analyzing an alleged tie involving computer support services); *Sheridan v. Marathon Petroleum Co.*, 530 F.3d 590, 592 (7th Cir. 2008) ("In a tying agreement, a seller conditions the sale of a product or service on the buyer's buying another product or service from or (as in this case) by direction of the seller.").

must make factual allegations sufficient to establish each element beyond the speculative level. *See Twombly*, 550 U.S. at 555.

### 1.        Two Distinct Services

To establish the existence of two separate services, BookLocker "must identify the products at issue in each tie and demonstrate that there is sufficient demand for the purchase of the tied product separate from the tying product to identify a distinct product market in which it is efficient to offer the tied product separately from the tying product." *Data Gen. Corp.*, 36 F.3d at 1179 (internal quotations and punctuation omitted).

Here, BookLocker alleges that Amazon is tying its sale of books in the Online Book Market via the Direct Amazon Sales Channel (the tying service) with POD book printing by its subsidiary, BookSurge (the tied service). *See Am. Compl.* ¶¶ 51, 55. BookLocker alleges that there are "a variety of printing companies" competing to provide POD book printing services, including BookSurge, Amazon's subsidiary, and Lightning Source, the current market leader and BookLocker's preferred POD printing company. *Id.* ¶¶ 5, 30-32. Although not explicitly stated in the Amended Complaint, the clear implication is that, unlike BookSurge, the majority of the POD book printing companies do not also offer online bookselling services.

Based on these allegations, it is reasonable to infer that customers of POD book printing services often (perhaps typically) purchase these services separate from participation in an online bookselling service, and that sufficient demand exists for POD book printing services such that a number of entities offer POD book printing without also engaging in online bookselling. Amazon does not refute, and the Court accepts, that online bookselling and POD book printing constitute distinct services.[5]

---

[5] Amazon conceded this point at oral argument.

Two distinct services or not, Amazon argues that the "tying" label cannot fit because BookLocker "cannot allege that Amazon.com is selling one product (a tying product) on condition that anyone buy a second product." *Def.'s Mot.* at 16.  To Amazon, "[t]here is no sale of a tying product at all." *Id.*

It is true that BookLocker's complaint does not describe the archetypical tying claim.  In the usual case, a manufacturer might condition the sale of a desired product A (the tying product) with the sale of an undesired product B (the tied product).  To get what it wants, product A, a customer of the manufacturer must also buy what it does not want, product B.

Here, while it is evident that POD publishers must pay for POD book printing, there is no indication that POD publishers typically make an out-of-pocket payment to Amazon for access to its Direct Amazon Sales Channel.  At the same time, outright monetary payment is not the only manner in which customers gain access to desired services.  In this case, according to BookLocker, "POD publishers effectively pay Amazon for [its] brokerage service by granting Amazon a percentage of the sales price of each transaction Amazon brokers."[6]  *Pl.'s Opp'n* at 10; *see also Am. Compl.* ¶ 29.  That Amazon charges a $29.95 annual fee for access to the Direct Amazon Sales Channel under the Advantage program, the alternative means by which POD publishers may gain access to the Direct Amazon Sales Channel, suggests Amazon itself views such access as a type of service it sells to POD publishers.  *Advantage Membership Agreement* ¶ 4.

---

[6] Amazon notes that BookLocker's contention is inconsistent with other statements in the Amended Complaint which indicate that Amazon's take from the sale of a book is based on the book's list price, not its sales price. *Def.'s Reply* at 7-8.  The important point, however, remains unaltered:  "Amazon effectively receives a commission from each sale." *Pl.'s Opp'n* at 10.

No case definitively resolves whether access to a service similar to the one provided by Amazon with its Direct Amazon Sales Channel may support a tying claim.[7]  In the past, the First Circuit expressed skepticism about whether a tie existed where a tying product did not take the conventional form of a product or service bought by a consumer.  *See Wells Real Estate, Inc. v. Greater Lowell Bd. of Realtors*, 850 F.2d 803, 815 (1st Cir. 1988) (expressing doubt whether membership in a trade organization could constitute a tying product where such membership was "tied" to access to membership benefits).  However, it has also accepted that commercial transactions lacking an outright "sale" of a tying product might constitute unlawful ties.  *See Data Gen. Corp.*, 36 F.3d at 1179-80 (accepting that licensing of software as opposed to outright sale could constitute the tying product); *see also Campbell v. Irving Oil Corp.*, No. 97-251-B, 1998 U.S. Dist. LEXIS 10439, at *10 (D. Me. May 5, 1998) (denying motion to dismiss where franchisee leased rather than bought restaurant); *Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Ltd.*, No. 02-12102-RWZ, 2006 U.S. Dist. LEXIS 43690, at *79-80 (D. Mass. June 28, 2006) (noting that licensing may constitute a commercial transfer sufficient to argue the existence of a tie).  At least one other circuit left open the possibility that a tie could involve a product neither paid for nor leased.  *See Marts v. Xerox, Inc.*, 77 F.3d 1109, 1112 (8th Cir. 1996) (leaving open the possibility that a warranty provided at no additional charge with the purchase of a copier might be a tying product, but noting that such a claim "does not fit easily into the existing structure of antitrust law").

Although these cases are hardly enthusiastic support for BookLocker, they do not mandate dismissal, nor foreclose the possibility that BookLocker has the makings of a cognizable claim.  In the face of such uncertainty, the Court is hesitant to dismiss the lawsuit at this early stage.  On the one hand, the Court is cognizant of the general trend in antitrust law

---

[7] BookLocker cites no such case and the Court has found none.

away from *per se* condemnation.  *See, e.g.*, *Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877 (2007) (abandoning a *per se* rule in the area of minimum resale price maintenance in favor of a rule of reason analysis).  On the other, the Court is chary to cut-off a claim on a motion to dismiss where the caselaw does not clearly exclude the possibility that alleged conduct may fit a persistent *per se* rule against tying.

As the Supreme Court counseled in *Jefferson Parish*, § 1 is concerned with competitive consequences not labels.  *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 21 n.34 (1984) ("The legality of petitioners' conduct depends on its competitive consequences, not on whether it can be labeled 'tying.'").  The most important question is whether Amazon has foreclosed competition on the merits in the market for POD printing by its conditioning of access to the Direct Amazon Sales Channel.  *See id.* at 12 ("[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms."); *Ill. Tool Works, Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 34-35 (U.S. 2006) (same).  The Court declines to make a premature judgment that BookLocker's allegations cannot constitute a tie because of the manner in which it accesses the tying service.[8]

### 2.     An Agreement or Condition that Establishes a Tie

Satisfaction of the second element, an agreement or condition that establishes a tie, "generally requires evidence that the supplier's sale of the tying product is conditioned upon the

---

[8] The Court rejects Amazon's characterization of BookLocker's allegations as describing a straightforward vertical supply arrangement.  *See Def.'s Mot.* at 12-14.  Similarly, it finds *Eastern Food Services, Inc. v. Pontifical Catholic University Services Association*, 357 F.3d 1 (1st Cir. 2004), an exclusive dealing case involving a lawsuit brought by a beverage provider against a university for contracting with another beverage provider to provide beverages on the university's campus, inapposite to the conduct alleged here:  tying of a service offered by one corporation to another service offered by a subsidiary.

unwilling purchase of the tied product from the supplier or an unwilling promise not to purchase the tied product from any other supplier." *Data Gen. Corp.*, 36 F.3d at 1180. "In the absence of an explicit tying agreement, conditioning may be inferred from evidence indicating that the supplier has actually coerced the purchase or non-purchase of another product." *Id.* Included in this latter category are so-called "announced ties," where proof that a seller has announced a tying condition suffices to create an inference of conditioning. *See George Lussier Enters. v. Subaru of New. Eng., Inc.*, No. 99-109-B, 2001 U.S. Dist. LEXIS 12054, at *27-29 (D.N.H. Aug. 3, 2001).

Whether the tie is explicit or inferred, the First Circuit has stated that, at least for the purposes of ruling on summary judgment, the requisite element of coercion is absent if there is no evidence that the tie has actually been implemented: "Where a tying product has not been withheld, there is no tie." *Borschow Hosp.*, 96 F.3d at 18 (affirming a district court grant of summary judgment against a tying plaintiff where the defendant threatened to withhold a product, but did not act on the threat); *see also Data Gen. Corp.*, 36 F.3d at 1180 (noting that "the anti-competitive effects of a tie [are not] unreasonable *per se* unless there is evidence that the supplier of the tying product has actually used its market power to impose the condition"). However, in ruling on class certification, the District of New Hampshire described a burden shifting analysis for announced ties. *George Lussier*, No. 99-109-B, 2001 U.S. Dist. LEXIS 12054, at *28-29. Under this approach, proof of a conditioning announcement alone is sufficient to create an inference of conditioning because the announcement creates the impression among buyers that the tying condition exists. *Id.* This inference may be rebutted if a defendant offers evidence that the announcement was not taken seriously. *Id.* at *29.

15

Here, BookLocker alleges an announced tie of Amazon's book sales and BookSurge's printing services.  According to the Amended Complaint, "no later than February 10, 2008, Amazon began notifying POD publishing companies that Amazon and the Bookstore would only directly sell to consumers POD books that were printed by BookSurge."  *Am. Compl.* ¶¶ 9, 36. On March 26, 2008, an Amazon representative personally informed BookLocker of the policy and threatened that "books printed by Lightning Source or any other competing printer would have their 'Add to Shopping Cart' buttons removed."  *Id.* ¶ 37.[9]

---

[9] Amazon has informed POD publishers that they may keep the Direct Amazon Sales Channel active if they agree to enroll in a program known as Amazon Advantage.  *Am. Compl.* ¶ 41.  Nevertheless, BookLocker discounts this secondary avenue to the Direct Amazon Sales Channel as a non-option, arguing that "the terms and conditions of participating in that program are so onerous so as to preclude it from being an economically viable option for POD book publishers."  *Id.*  BookLocker elaborates:

> First, the 'Amazon Advantage' contract requires publishers to deposit five copies of each title with Amazon at the publisher's own expense—Amazon does not pay for any book until an order is received and paid for by a customer.  It would be prohibitively expensive for a POD publisher to front this enormous cost.  For example, since Plaintiff currently publishes 1,200 titles, it would have to pay for 6,000 books to be printed and supplied to Amazon.  Plaintiff's expenses merely to join this program would easily exceed $35,000 before any revenue was received, with a continuing obligation to incur costs of placing POD books in Amazon's inventory.  Second, under the 'Amazon Advantage' program, Amazon only remits 45% of a POD book's list price to the publisher once it has been purchased by an ultimate consumer.  These financial terms would force Plaintiff to sell its books at a loss or to price its books beyond what the market will bear.

*Id.*

As previously discussed, Amazon has submitted, and the Court is free to consider in ruling on the pending motion, the Advantage Membership Agreement.  Nevertheless, on the limited record before it, it is impossible for the Court to adequately evaluate the reasonableness of all of the terms included therein.

At this point, the Court is required to "draw[] all reasonable inferences in the plaintiff's favor."  *Fitzgerald*, 549 F.3d at 52.  From BookLocker's allegations, it is reasonable to infer that Plaintiff and other entities have found the Advantage program to be an untenable alternative to the Direct Amazon Sales Channel.  Accordingly, the Court accepts for the purposes of this motion BookLocker's assertion that Advantage is not a viable option.  *See Marts*, 77 F.3d at 1113 ("Even if the products are available separately, an illegal tying arrangement can exist if purchasing the items together is the only viable economic option." (internal quotation omitted)); *Ways & Means, Inc. v. IVAC Corp.*, 506 F. Supp. 697, 701 (N.D. Cal. 1979) ("[S]eparate availability will not preclude antitrust liability where a defendant has established its pricing policy in such a way that the only viable economic option is to purchase the tying and tied products in a single package."), *aff'd* 638 F.2d 143 (9th Cir. 1981), *cert. denied* 454 U.S. 895 (1981).

In a similar vein, the Court accepts for the time being BookLocker's allegation that selling books via the Amazon Marketplace is an unviable substitute to listing on the Direct Amazon Sales Channel.  Supporting such a finding are BookLocker's allegations (i) that BookSurge itself advertises the Direct Amazon Sales Channel as "a distinction proven to life sales"; (ii) that Marketplace consumers must provide shipping information to third-party vendors and cannot take advantage of free shipping programs; (iii) that "only a small fraction of POD book Bookstore sales are effectuated through the Amazon Marketplace"; (iv) that Marketplace book prices are often inflated to the detriment of sales due to Amazon's requirement that publishers impose a preset shipment charge per book; (v) that some authors have advised BookLocker that they will retain other publishers if BookLocker lacks access to the Direct Amazon Sales Channel; and (vi) that Marketplace participation would require additional staff to handle the program's data entry requirements.  *See Am. Compl.* ¶¶ 25-26, 42-44.

The Complaint does not explicitly state that Amazon has acted upon its threat to close off the Direct Amazon Sales Channel to non-BookSurge users.  However, BookLocker's allegation that "at least four POD publishers have been coerced into signing a contract with BookSurge (with the attendant higher prices and lower quality) in order to secure and retain customers," *Am. Compl.* ¶ 47, suggests that Amazon may have taken steps beyond mere warning.  Further, Amazon's "open letter to interested parties" posted to its website unmasks its intention to implement such a scheme:

> One question that we've seen is a simple one.  Is Amazon requiring that print-on-demand books be printed inside Amazon's own fulfillment centers, and if so why?
>
> Yes.
>
> . . .
>
> Another question we've seen:  Do I need to switch completely to having my POD titles printed at Amazon?
>
> No, there is no request for exclusivity.  Any publisher can use Amazon's POD service just for those units that ship from Amazon and continue to use a different POD service provider for distribution through other channels.

*See Def.'s Mot.* at Attach. 1, *Open Letter to Interested Parties* (Docket # 38-2).  Finally, unlike *Borschow* where the defendant's threats did not injure the plaintiff, *see Borschow*, 96 F.3d at 17, BookLocker alleges that several authors have gone elsewhere to publish because of Amazon's actions.  *See Am. Compl.* ¶¶ 43, 48.  Whether the requirement is an announcement or actual implementation, the combination of BookLocker's allegations and Amazon's letter suffice to

---

Discovery may yet show that the Advantage program and the Marketplace are reasonable alternatives to transitioning to BookSurge, and that Amazon's multi-tiered approach is efficiency-enhancing.  *See Sheridan*, 530 F.3d at 595-96 (holding that a program whereby franchisees are required to honor the franchisor's credit cards and to process sales with them did not constitute a tie, but instead a system allowing the franchisor's customers to have the same purchasing experience no matter which franchisee they purchase from).  To this end, the Seventh Circuit's analysis in *Sheridan* may well prove applicable.  In that case, Judge Posner noted that a powerful financial incentive to use one service where alternatives exist does not necessarily constitute a penalty imposed by the service provider, but may instead be an efficiency enhancing arrangement akin to inclusion of tires on a new car.  *Sheridan*, 530 F.3d at 595-96.

permit the plausible inference that Amazon is unlawfully forcing purchase of its POD printing service.[10]

Amazon's contention that BookLocker has failed to adequately allege concerted action, *Def.'s Mot.* at 3-9, does not change the result.  Generally, concerted action is a prerequisite for a § 1 claim.  *See Podiatrist Ass'n v. La Cruz Azul de P.R., Inc.*, 332 F.3d 6, 12 (1st Cir. 2003) (noting that the language of Section 1 necessitates that a plaintiff "show concerted action between two or more separate parties"); *Euromodas*, 368 F.3d at 16.  In the First Circuit, in a *per se* tying claim, it appears that this requirement is subsumed in the requirement that there be an agreement or condition, express or implied, that establishes a tie.  *See Data Gen. Corp.*, 36 F.3d at 1180 ("Proof of a tying arrangement generally requires evidence that the supplier's sale of the tying product is conditioned upon the unwilling purchase of the tied product from the supplier or an unwilling promise not to purchase the tied product from any other supplier."); *Ticket Ctr., Inc. v. Banco Popular De P.R.*, 613 F. Supp. 2d 162, 176 (D.P.R. 2008) (noting that "the absence of any tying or conditioning agreements is sufficient to require summary judgment").

In the tying context, concerted action is typically shown by evidence that one party was coerced into accepting the tying arrangement.  *See Data Gen. Corp.*, 36 F.3d at 1180-81 (noting that "[i]n the absence of an explicit tying agreement, conditioning may be inferred from evidence indicating that the supplier has actually coerced the purchase or non-purchase of another product" and affirming summary judgment where the plaintiff failed to provide proof that the defendant coerced consumers to accept a tying arrangement); *see also Systemcare, Inc. v. Wang Labs. Corp.*, 117 F.3d 1143 (10th Cir. 1997) ("[T]ying most frequently constitutes a reluctant combination and not an eager conspiracy"); *Datagate, Inc. v. Hewlett-Packard Co.*, 60 F.3d

---

[10] If discovery reveals that Amazon has not acted on its announced plan to limit access to its Direct Amazon Sales Channel to POD publishers who use BookSurge, BookLocker will have to contend with *Borschow Hospital* and its apparent insistence that threats be carried out.  *See Borschow Hosp.*, 96 F.3d at 18.

1421, 1426-27 (9th Cir. 1995) ("A showing that the buyer of the tied product was coerced by the tying arrangement into making the purchase is sufficient to show that the buyer was not merely 'acting independently.'"); *Will v. Comprehensive Accounting Corp.*, 776 F.2d 665 (7th Cir. 1985) (holding that a contract between a franchisor and a franchisee that ties data processing to franchise rights satisfies the concerted action requirement).

The allegations in BookLocker's Amended Complaint combined with Amazon's letter support the inference that some POD publishers have been coerced by Amazon's threats.  At this point, it need do no more to satisfy the concerted action requirement.

### 3.      Sufficient Economic Power

"[I]n all cases involving a tying arrangement, the plaintiff must prove that the defendant has market power in the tying product." *Ill. Tool Works*, 547 U.S. at 46; *Data Gen. Corp.*, 36 F.3d at 1179 (noting that the entity accused of tying must have "sufficient economic power in the market for the tying product to distort consumers' choices with respect to the tied product"). Economic or market power is "the power to force a purchaser to do something that he would not do in a competitive market" and "ordinarily is inferred from the seller's possession of a predominant share of the market." *Eastman Kodak Co. v. Image Technical Servs. Inc.*, 504 U.S. 451, 464 (1992) (citation and internal quotation omitted); *SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.*, 188 F.3d 11, 16 (1st Cir. 1999) (noting that "[m]arket share often serves as a proxy for market power").  The Supreme Court has not defined how much market share constitutes a predominant share.  *See Jefferson Parish*, 466 U.S. at 26-27 (concluding that a thirty percent market share was "far from overwhelming" and did "not establish the kind of dominant market position" that entitled a plaintiff to a finding that the tying arrangement was *per se* illegal). Nevertheless, post-*Jefferson Parish*, there seems to be a consensus building that thirty percent is

19

a threshold.  *See Grappone, Inc. v. Subaru of New Eng., Inc.*, 858 F.2d 792, 797 (1st Cir. 1988) (noting that if thirty percent market share was not enough for the Supreme Court in *Jefferson Parish*, "it is difficult to see how . . . smaller figures could show the contrary");  *see also Hardy v. City Optical Inc.*, 39 F.3d 765, 767 (7th Cir. 1994) (stating that thirty percent is "the minimum market share from which the market power required to be shown at the threshold of a tying case can be inferred"); *PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811, 818 (6th Cir. 1997) (citing *Jefferson Parish* for the rule that "[a] thirty-percent share of the market, standing alone, provides an insufficient basis from which to infer market power"); *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 481 (3d Cir. 1992) (noting that twelve percent of the domestic automobile market is insufficient to establish market power).

BookLocker's Complaint identifies the relevant tying market as the sale of books in the Online Book Market.  *See Am. Compl.* ¶ 52.  It defines the Online Book Market as "the market for physical books ordered online by consumers and then delivered to consumers by means of a shipping service."  *Id.* ¶ 22.  It alleges that POD publishers use the Online Book Market "to sell the vast majority of their books."  *Id.* ¶ 23.  It asserts that "Amazon's Bookstore is the dominant channel through which consumers purchase POD books in the Online Book Market," and that Amazon's market share in the Online Book Market is "up to 70%."  *Id.* ¶ 24.

Amazon contests the sufficiency of BookLocker's factual assertions, arguing that the actual tying market is the provision of online POD book sales services to POD publishers.  *Def.'s Mot.* at 19-20.  Amazon contends that the Amended Complaint offers no allegations to support a connection between market power in this market and market power in the market for the sale of all books in the Online Book Market.  *Id.*

Whether the relevant tying product market is defined broadly as the sale of books in the Online Book Market, or narrowly as the provision of online POD book sales services to POD publishers, the Court is satisfied that BookLocker has met its burden for the purposes of a motion to dismiss.  Under either formulation, it is reasonable to infer market power, "the power to force a purchaser to do something that he would not do in a competitive market," *Eastman Kodak Co.*, 504 U.S. at 464, where (i) up to seventy percent of all books sold online are sold by Amazon; (ii) POD publishers sell the vast majority of their books online; (iii) several POD publishers faced with the prospect of losing access to Amazon's sales services have acceded to its requirement to utilize its inferior quality, higher cost POD printing service; and (iv) authors of POD books have refused to work with BookLocker unless BookLocker similarly accedes and retains Amazon's sales service.  *See Am. Compl.* ¶¶ 23-24, 35, 47-48.  The third element is satisfied.

### 4.    Tie Forecloses a Substantial Amount of Commerce in Tied Product

The fourth element requires that the tie foreclose a substantial amount of commerce in the market for the tied product.  *Data Gen. Corp.*, 36 F.3d at 1179.  As with market power, there is no clearly established rule for what constitutes "a substantial amount."   Instead, the plaintiff "must make some minimal showing of real or potential foreclosed commerce caused by the tie, if only as a matter of practical inferential common sense."  *Wells Real Estate*, 850 F.2d at 815 n.11. In other words, there must be some indication of "anti-competitive effects in the market for the tied product."  *Id.* at 815.

Here, the tied product market is POD book printing.  The Amended Complaint alleges that there are "thousands of POD publishers presently operating in the United States, who in the aggregate publish hundreds of thousands of titles," and asserts that POD books "are predominantly sold through online bookstores," the largest of which is Amazon's Bookstore.

*Am. Compl.* ¶¶ 4, 6.  Since February 2008, these POD publishers have faced the prospect of losing access to a primary mode of selling their books online unless they agree to transition to printing with Amazon's subsidiary, BookSurge.  *Id.* ¶ 36.  In response, "at least four POD publishers have been coerced into signing a contract with BookSurge (with attendant higher prices and poorer quality) in order to secure and retain customers."  *Id.* ¶ 47.

It is a question of material fact what effect, if any, Amazon's conduct has had on the market for POD printing services.  Given the factual assertions in the Complaint, it is plausible that more than the four POD publishers identified by BookLocker likely acquiesced to Amazon's announced tie.  Indeed, if the allegations are true, and the Court must assume that they are at this point, it is likely Amazon's conduct has influenced the POD printer choice of a significant number of POD printers.  The Court concludes that BookLocker has satisfied its burden to make "some minimal showing" under *Wells Real Estate*.[11]  850 F.2d at 815 n.11.

## B.    Standing and Antitrust Injury

As with all legal claims, a plaintiff seeking relief for violation of antitrust law must have standing to bring the claim.  In determining standing in an antitrust action, the Court considers six factors:

> (1) the causal connection between the alleged antitrust violation and harm to the plaintiff; (2) an improper motive; (3) the nature of the plaintiff's alleged injury and whether the injury was of a type that Congress sought to redress with the antitrust laws ('antitrust injury'); (4) the directness with which the alleged market restraint caused the asserted injury; (5) the speculative nature of the damages; and (6) the risk of duplicative recovery or complex apportionment of damages.

*Serpa Corp. v. McWane, Inc.*, 199 F.3d 6, 10 (1st Cir. 1999).  In a footnote, Amazon questions BookLocker's ability to satisfy the third factor:  antitrust injury.  *Def.'s Mot.* at 9 n.2.

---

[11] For its part, Amazon argues that anti-competitive effect cannot be shown because Lightning Source, not BookSurge, is the dominant POD printer, and BookLocker has not alleged any threat to Lightning Source's dominance.  *Def.'s Mot.* at 20-21.  While such an allegation would certainly buttress BookLocker's claim, Amazon offers and the Court is unaware of any authority for such a requirement.

As a general rule, "[c]ompetitors and consumers in the market where trade is allegedly restrained are presumptively the proper plaintiffs to allege antitrust injury." *Serpa Corp.*, 199 F.3d at 10-11. Further, in the context of tying, "[a] plaintiff need not have actually consented to the purchase of the tying and tied products in order to bring a claim under the Sherman Act." *Wells Real Estate*, 850 F.2d at 814. Instead,

> [i]n order to have standing . . . the plaintiff need only have been injured by the alleged anticompetitive act -- it need not have been injured directly by the very anticompetitive effects sought to be remedied by the statute. The plaintiff must assert an 'injur[y] in his business or property by reason of anything forbidden in the antitrust laws.'

*Id.* at 815 (quoting 15 U.S.C. § 15); *Serpa Corp.*, 199 F.3d at 10-11 ("The harm [to the plaintiff] should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." (internal quotation omitted)).

Here, BookLocker is fairly characterized as a consumer of online bookselling services as well as POD book printing services and is, therefore, presumptively a proper plaintiff to allege antitrust injury. BookLocker alleges that it has "been harmed financially by Amazon's anticompetitive conduct because several potential clients (authors) stated that they refused to use Plaintiff's POD publishing services after being informed that Plaintiff had not signed the BookSurge contract." *Am. Compl.* ¶ 48. Further, BookLocker alleges that other POD publishers have already been coerced to sign contracts with the poorer quality, higher cost BookSurge, *Am. Compl.* ¶ 47, a trend which if it continues could plausibly result in market effects detrimental to BookLocker. This is sufficient to establish BookLocker's standing to pursue its claim.

### C.   *Twombly* **and the Expense of Antitrust Discovery**

In *Twombly*, the Supreme Court confronted the question of what a plaintiff must plead in order to establish a conspiratorial agreement under § 1 of the Sherman Act. 550 U.S. 544.

23

Before the *Twombly* Court was a putative class action brought by telephone and internet subscribers against several major telecommunications providers. *Id.* at 550. The plaintiffs alleged that the providers had conspired to restrain trade in violation of § 1 of the Sherman Act by engaging in parallel conduct to inhibit entry of new competitors and by making agreements to refrain from competing against one another. *Id.* at 550-51. In granting defendants' motion to dismiss, the Supreme Court rejected the sufficiency of plaintiffs' allegations of parallel conduct by the providers to establish the agreement between them required to establish a conspiracy. *Id.* at 569-70.

In *Twombly* dicta, the Court linked the legal standard applied to motions to dismiss to efficiency concerns particularly relevant in the antitrust context:

> when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court.
>     Thus, it is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, but quite another to forget that proceeding to antitrust discovery can be expensive. As we indicated over 20 years ago in *Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 528, n.17 (1983), a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed.

*Id.* at 558 (internal quotations and citations omitted). Analyzing the case at hand, the Supreme Court concluded:

> [The] potential expense is obvious enough in the present case: plaintiffs represent a putative class of at least 90 percent of all subscribers to local telephone or high-speed Internet service in the continental United States, in an action against America's largest telecommunications firms (with many thousands of employees generating reams and gigabytes of business records) for unspecified (if any) instances of antitrust violations that allegedly occurred over a period of seven years.

*Id.* at 559. Later, the *Twombly* Court emphasized that "determining whether some illegal agreement may have taken place between unspecified persons at different [telecommunications

providers] (each a multibillion dollar corporation with legions of management level employees) at some point over seven years is a sprawling, costly, and hugely time-consuming undertaking." *Id.* at 560 n.6.

Because the Court is satisfied that BookLocker has survived Amazon's motion to dismiss by making allegations with "enough heft to set forth a plausible entitlement to relief," *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (internal quotations omitted), it need not make any separate finding with respect to discovery concerns.   Nonetheless, in evaluating BookLocker's claim the Court has remained sensitive to the fact that "proceeding to antitrust discovery can be expensive." *Twombly*, 550 U.S. at 558; *Am. Steel Erectors, Inc. v. Local Union No. 7, Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers*, 536 F.3d 68, 77 n.7 (1st Cir. 2008).   In that regard, the concerns in this matter seem of a lesser magnitude than those faced in *Twombly*.   For example, here, there is no need to scour Amazon's records for evidence of the conspiratorial conduct; Amazon has publicly announced a policy and the question is whether that policy is unlawful.

### D.    Restitution and Disgorgement

In response to Amazon's challenge, BookLocker withdraws its demand for restitution and disgorgement. *Pl.'s Opp'n* at 22 n.16.   Accordingly, BookLocker's prayer for these remedies is dismissed.

## V.    CONCLUSION

Judge Posner recently discussed the "traditional antitrust concern" with tying:   "if the seller of the tying product is a monopolist, the tie-in will force anyone who wants the monopolized product to buy the tied product from him as well, and the result will be a second monopoly." *Sheridan*, 530 F.3d at 592.   It remains a matter of material fact whether this concern

is realized here or whether Amazon is engaging in efficiency enhancing pro-competitive conduct. Nonetheless, indulging all reasonable inferences in Plaintiff's favor, BookLocker's Complaint raises a plausible right to relief.

The Court GRANTS Defendant Amazon's Motion to Dismiss Amended Complaint (Docket # 38) to the extent that BookLocker's claim for restitution and disgorgement are DISMISSED. On all other issues, Amazon's motion is DENIED.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 26th day of August, 2009

26